# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PEERLESS INDUSTRIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 11 C 1768 |
| v. | ) |
| | ) Judge Joan H. Lefkow |
| CRIMSON AV, LLC; VLADIMIRI | ) |
| GLEYZER, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Peerless Industries, Inc. filed a complaint against Crimson AV, LLC and Vladimiri Gleyzer alleging, among other claims, tortious interference with contract entered into by Peerless and one of its suppliers.[1] Peerless has filed a motion for a preliminary injunction to enjoin defendants from selling or offering to sell products received in breach of the supply agreement. A hearing was held on the preliminary injunction on June 7, 2011. For the following reasons, Peerless's motion for a preliminary injunction [# 23] will be denied.

## BACKGROUND

Peerless is one of the leading manufacturers of audio-visual mount equipment in the world. It sells premium audio-visual mounts primarily to distributors and dealers who then install the mounts in buildings such as stadiums, schools, and airports. On May 23, 2007, Peerless entered into a supply agreement with Sycamore Manufacturing Co., Ltd., a Chinese

---

[1] Peerless also alleged claims for civil conspiracy, patent infringement, and violation of the Illinois Deceptive Trade Practice Act, 815 Ill. Comp. Stat. 505/1, *et seq*. The court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367. Venue is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

manufacturer. The supply agreement includes a non-competition provision that provides that Sycamore shall not sell or otherwise provide any "Peerless Products" to Peerless's competitors:

> Buyer's Exclusivity. A "Peerless Product" is one which is designed by Peerless or which is normally sold by Peerless under any Peerless Trademark or one which Supplier sells or has sold to Buyer. Supplier shall not make any Peerless Products except those to be sold to Buyer hereunder, or sell or otherwise provide any Peerless Products to anyone other than Buyer, during the term of this Agreement or at any time thereafter.

Sycamore Supply Agreement § 2. The non-competition provision further provides that Sycamore shall not sell or otherwise provide any products that are similar to "Peerless Products" during the term of the supply agreement and for one year after termination:

> "Similar Products" means any mounts for any audiovisual equipment or monitors which, in Buyer's reasonable judgment, has substantially the same appearance as or reflects or contains any part of the design of any Peerless Product. During the term of this Agreement and for one (1) year thereafter, Supplier shall not sell or otherwise provide any Similar Products to anyone other than Buyer in the "Territory" consisting of North America (including Mexico) and Hawaii, nor shall Supplier sell or otherwise provide any Similar Products to anyone anywhere in the world if Supplier has reason to know that such Similar Products are intended for use in the Territory or are reasonably likely to be used in the Territory, or are reasonably likely to be used in the Territory, or previously have actually come into use in the Territory other than in insignificant quantities.

*Id.* The supply agreement also provides that, upon termination, Sycamore will immediately return to Peerless any confidential information and equipment that Peerless had shared with Sycamore. *Id.* §§ 7, 10, 12.

Sycamore manufactured and shipped products to Peerless pursuant to the Supply Agreement until March 2010. The parties do not agree upon the date of termination of the supply agreement, but the record is clear that as of March 29, 2010 at the latest, Peerless had terminated the supply agreement. Thus, under the terms of the supply agreement, Sycamore was no longer

permitted to manufacture Peerless Products and was prohibited from manufacturing and shipping any Similar Products to North America for one year.

On May 20, 2010, Crimson was incorporated as an LLC with the Illinois Secretary of State. Crimson's sole member is a Hong Kong company called Modern Century Development Ltd. The salaries of its officers and office expenses, however, are paid by Sycamore. Vladimir Gleyzer is Crimson's managing director. He started working for Crimson on August 1, 2010, after Sycamore's president, Baohua "Tony" Jin, asked him if he would be interested in starting a company in the United States.

Jin and Gleyzer had worked together previously because Gleyzer, a former senior vice president at Peerless, had helped establish Peerless's manufacture and supply system in China. When they started working together at Crimson, both Gleyzer and Jin were aware of the supply agreement between Sycamore and Peerless. Jin had signed the agreement on behalf of Sycamore, and Gleyzer was listed as the contact person for notices to Peerless. Gleyzer had also received drafts of the Sycamore supply agreement from Peerless's counsel during the agreement negotiation process. In addition, in September of 2006, Gleyzer and Jin had signed a nearly identical supply agreement on behalf of Peerless and Kunashan North Bay AV Equipment Co. Ltd., Jin's former company.

Beginning in July 2010, Sycamore began to ship audio-visual equipment to Crimson from China. Sycamore's invoices and packing slips reflect that it sent shipments on July 8 and November 25, 2010 and on January 19, 28, and February 14, 2011. Crimson began to display products on its website and sold its products to three customers, one of whom was previously a customer of Peerless. Sycamore is Crimson's primary, but not its only, supplier.

In January 2011, Peerless received an email from an individual who purported to be the senior vice president of its largest customer. The emails stated that Crimson was selling Peerless products in the marketplace at a significant discount and that this was extremely detrimental to Peerless's business. Peerless soon determined that the emails had not, in fact, been sent by its customer. Peerless also reviewed the products offered for sale on Crimson's website. Peerless concluded that many of the products being advertised Crimson are Similar Products as defined in the supply agreement with Sycamore and that they had been shipped to Crimson in violation of the agreement's one-year non-compete provision.

## LEGAL STANDARD

A party seeking a preliminary injunction or a temporary restraining order must demonstrate that (1) its claim has some likelihood of success on the merits; (2) traditional legal remedies would be inadequate; and (3) absent injunctive relief, it will suffer irreparable harm in the period prior to final resolution of its claim. *Girl Scouts of Manitou Council* v. *Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008). If the moving party satisfies these threshold requirements, the court must balance the threatened injury to the moving party with the threatened harm the injunction may inflict on the nonmovant. *Id.* The court also must consider the public interest in either the grant or denial of the injunctive relief. *Id.* In applying these criteria, the court uses a "sliding scale" approach: if a claim is very likely to succeed on the merits, less harm to the plaintiff will be required to justify injunctive relief and vice versa. *Abbott Labs.* v. *Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992).

## ANALYSIS

To prevail on its motion for injunctive relief, Peerless must first show some likelihood of

success on the merits. This is a low threshold, requiring only that Peerless's chances of prevailing be "better than negligible." *Meridian Mut. Ins. Co.* v. *Meridian Ins. Group*, 128 F.3d 1111, 1114 (7th Cir. 1997) (citations omitted). In order to succeed on a claim for tortious interference with contract, a plaintiff must establish (1) the existence of a valid and enforceable contract, (2) defendants' awareness of the contract, (3) defendants' intentional and unjustified inducement of a breach of the contract, (4) subsequent breach of contract caused by the defendants' conduct, and (5) damages. *See, e.g.*, *Dopkeen* v. *Whitaker*, 926 N.E.2d 794, 797, 399 Ill. App. 3d 682, 339 Ill. Dec. 319 (2010); *Burrell* v. *City of Mattoon*, 378 F.3d 642, 651–52 (7th Cir. 2004).

To prevail on its tortious interference claim, Peerless must show that the contract between Peerless and Sycamore was valid and that it was breached. That contract is a restraint of trade, which is disfavored by common law. *See, e.g.*, *Cent. Water Works Supply, Inc.* v. *Fisher*, 608 N.E.2d 618, 621, 240 Ill. App. 3d 952, 181 Ill. Dec. 545 (1993). Under Illinois law, a valid restraint on trade may be based on the sale of a business or "any other analogous circumstance giving one party a just right to be protected against competition from the other." *More* v. *Bennett*, 29 N.E. 888, 891, 140 Ill. 60 (1892). It is well-established that to be enforceable, a restrictive covenant must be reasonable. *Bus. Records Corp. v. Lueth*, 981 F.2d 957, 961 (7th Cir. 1992); *Hamer Holding Group, Inc.* v. *Elmore*, 560 N.E.2d 907, 915, 202 Ill. App. 3d 944, 148 Ill. Dec. 310 (1990); *Union Trust & Sav. Bank of E. St. Louis* v. *Kinloch Long-Distance Tel. Co. of Mo.*, 258 Ill. 202, 207 (1913). The terms of a restrictive covenant (1) must not be greater than necessary to protect the employer, (2) must not be oppressive to the employee, and (3) must not injure the general public. *Liautaud* v. *Liautaud*, 221 F.3d 981, 987 (7th Cir. 2000)

5

(collecting Illinois cases). Courts must also consider the propriety of the restrictions in terms of their length in time, their territorial scope, and the activities they restrict. *Cambridge Eng'g, Inc.* v. *Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 522, 378 Ill. App. 3d 437, 316 Ill. Dec. 445 (2007); *Lueth*, 981 F.2d at 961. Whether a restrictive covenant is reasonable is a question of law to be decided by the court. *Liautaud*, 221 F.3d 986. Reasonableness cannot be determined in the abstract, however, and it necessarily depends on the unique facts and circumstances of each case. *Id.* at 987.

The parties agree that all of the products at issue must be considered under the provision in the supply agreement that bars Sycamore from selling Similar Products for one year after termination of the agreement. The language of the competition provision is very broad. It bars Sycamore from selling any audiovisual equipment that has substantially the same appearance as or reflects or contains "any part of the design of any Peerless Product." Thus, the feature of the Peerless Product that appears in the Similar Product need not be aesthetically or functionally significant to the Peerless Product or the Similar Product. Nor does it need to be likely that one product could not be distinguished from the other in the marketplace. Finally, the determination of whether any equipment can be considered a Similar Product shall be made according to Peerless's "reasonable judgment."

Nicholas Belcoure, the vice president of North American sales for Peerless, testified regarding the business interests that Peerless seeks to protect through the restrictive covenant in the supply agreement. Belcoure explained that Peerless sells "premium" audio-visual equipment and that its relationships with its customers will be harmed if they believe that they can purchase a similar product at a significantly cheaper price from Crimson. Belcoure testified that Peerless

sells its products primarily to professional distributors and installers, rather than individual customers, and therefore the success of Peerless's business model is dependent upon maintaining solid relationships with its high-volume customers. Belcoure asserted that because the identified Crimson products have the same appearance as Peerless's "staple" products, confusion between the two companies' products in the marketplace would be damaging to Peerless's sales and customer relations. Belcoure further testified that, from a "sales perspective," a Similar Product is product that a customer would mistake for a comparable Peerless product. He explained that the Similar Products that Peerless has identified in this litigation have features that are unique to Peerless products and that these features are used for sales differentiation between products.[2]

James Walters, the director of customer product development at Peerless, identified approximately 41 Similar Products in Crimson's inventory by applying a more technical standard. Walters testified that he understands Similar Products to include "anything based on looks, aesthetics, or functionality based on current or previous Peerless products." Some of the Crimson products that Walters identified had a very similar appearance as a Peerless product. Others did not, but shared design features such as the use of a multiwasher as a component of the product. Walters explained that a Crimson product may be "similar to" a Peerless product even if a customer would not confuse the two products in the marketplace.

According to Illinois common law principles the covenant restraining the sale of Similar Products is unenforceable. The restrictive covenant is only reasonable if its terms are "not . . .

---

[2] Belcoure's understanding of Similar Products appears to be similar to the understanding articulated by Peerless's counsel during opening arguments, namely that "[s]imilar products are essentially products that in the reasonable judgment of Peerless look like or could be perceived in the marketplace as Peerless products."

greater than necessary" to protect Peerless's interests. *Liautaud*, 221 F.3d at 986. The scope of the products included in the restrictive covenant are beyond what is necessary to protect Peerless's business interest. Belcoure testified Peerless's primary business interest is to protect itself from the sale of less expensive but substantially similar products to Peerless's customers. A subset of the Similar Products identified by Peerless, however, contain more difficult-to-detect design similarities that Peerless does not identify as significant from a sales perspective. Peerless has not shown that the sale of a product that reflects "any" part of the design of its products will harm its interests in the marketplace.

Moreover, the scope of products that Sycamore is barred from providing is unworkably difficult to determine. As Walters' testimony showed, Peerless's determination of what constitutes a Similar Product entails a detailed analysis of the various design features of each product at issue. Walters testified that his opinion had changed as to whether certain products were, or were not, Similar Products as he completed his review of the design specifications and product samples made available to him. It is unfairly burdensome to expect Sycamore to review not only all of its products, but also all of Peerless's current and prior products, in enough detail so as to identify "any" part of "any" Peerless Product that is "reflect[ed]" in a Sycamore product. Finally, if the determination of what constitutes a Similar Product shall be made solely according to "Peerless's reasonable judgment," then the non-competition provision may like the sword of Damocles restrain Sycamore from producing any competing product rather than risk liability.

Peerless argues, to the contrary, that under Illinois law it would have been reasonable to bar Sycamore from selling *all* audiovisual mounting equipment and that the supply agreement is less restrictive than what could be permitted. The cases cited by Peerless are either factually

8

distinguishable or are not directly on-point. *See Bus. Records Corp.* v. *Lueth*, 981 F.2d 957, 961–62 (7th Cir. 1992) (covenant not to compete with former employers' business was ancillary to the sale of a business); *Advent Elec., Inc.* v. *Buckman*, No. 95-305, 1996 U.S. Dist. LEXIS 84747, at *54 (N.D. Ill. June 24, 1996) (enforcing restrictive covenant without analysis of the reasonableness of its terms); *Central Water Works Supply, Inc.* v. *Fisher*, 608 N.E.2d 618, 240 Ill. App. 3d 952, 181 Ill. Dec. 545 (1993) (covenant not to compete was part of shareholder agreement that was ancillary to the formation of a business).[3] Indeed, courts have not been willing to enforce a blanket ban on competition in a given market. *Arco, Inc.* v. *Haas*, 842 N.E.2d 265, 273–74, 363 Ill. App. 3d 396, 299 Ill. Dec. 526 (2005) (shareholders' covenant that prohibited share purchaser from being involved in "any business or venture that sells products competitive to those of [restricting company]" was a "blanket prohibition on competition"); *Kempner Mobile Electronics, Inc.* v. *Sw. Bell Mobile*, No. 02 C 5403, 2003 WL 1057929, at *23

---

[3] Illinois courts apply different levels of scrutiny to covenants not to compete, depending on the business interests the restricting party seeks to protect. The two most common categories of non-competition agreements are those that are ancillary to the sale of a business and those that arise from an employment relationship. *See Liautaud*, 221 F.3d at 986. Courts are less likely to find that an agreement ancillary to the sale of a business is unenforceable. *Hamer*, 560 N.E.2d at 915. The rationale is that "[i]n the sale of a business the interest to be protected is the value of the goodwill that is purchased" and that the bargaining position between the parties is not uneven, as it is in the employer/employee relationship. *Id.* at 916 (citation omitted). In the employment context, courts assume that the interest the employer is seeking to protect is the possibility of losing clientele due to the appropriation of confidential information by the employee. *Id.* Therefore in order to establish that a restriction on trade is reasonable the employer must show additional special circumstances such as a near-permanent relationship with the employer's customer or the existence of customer lists, trade secrets, or other confidential information. *Id.* The court will not analogize the facts of this case to either the sale of business or the employment agreement context. *See Liautaud*, 221 F.3d at 987 (omitting the analysis); *cf. Lueth*, 981 F.2d at 959 (the "threshold issue" was whether the noncompetition agreement in the case could be properly characterized as a "covenant to a purchaser" or a "covenant to an employer"). In any event, this case shares certain characteristic with each: the agreement was presumably at arms' length and between equals, but the interest that Peerless seeks to protect is similar to the interests that are usually discussed in the employment agreement context.

9

(N.D. Ill. Mar. 10, 2003) (covenant barring cellular services distributor from selling "*any competing cellular product to anyone*" was not reasonably tailored to protect the interest of cellular services provider); *Stunfence, Inc.* v. *Gallagher Sec. (USA), Inc.*, No. 01 C 9627, 2002 WL 1838128, at *7 (N.D. Ill. Aug. 12, 2002) (restrictive covenant that resulted in distributor's "wholesale exclusion from his chosen field" was not enforceable). In sum, on the record before it, the court is left to conclude that the covenant not to compete is overly broad and beyond that necessary to protect Peerless's legitimate business interests. There is negligible likelihood that Peerless can prove breach of the supply agreement, an element of its tortious interference claim.

Peerless has also failed to demonstrate that traditional legal remedies are inadequate or that it will suffer irreparable harm if an injunction is not ordered. By Peerless's own calculation, Sycamore was allowed to ship Similar Products after March 29, 2011 under the terms of the supply agreement. Illinois courts are reluctant to extend the time period for a non-compete provision, in part because restrictive covenants are to be strictly construed. *See Citadel Inv. Group, LLC* v. *Teza Techs. LLC*, 924 N.E.2d 95, 104–06, 398 Ill. App. 3d 724, 338 Ill. Dec. 235 (2010). Peerless's supply agreement does not include language regarding an extension of the non-compete period, and Peerless has not demonstrated that the unique circumstances of this case justify an extension absent explicit contractual authorization. Thus, the damages that Peerless may have incurred as a result of Sycamore's shipment of Similar Products prior to March 29, 2011 are readily quantifiable. Since Sycamore is no longer prohibited from providing or selling Similar products to Crimson, Peerless cannot argue that it will suffer irreparable harm prior to the resolution of its other claims against Sycamore and Gleyzer. Therefore Peerless has not satisfied the requirements for the threshold phase of the court's preliminary injunction

analysis, and its motion must be denied. *See Girl Scouts*, 549 F.3d at 1085–86.

## CONCLUSION AND ORDER

For the foregoing reasons, Peerless's motion for a preliminary injunction [#23] is denied. This case will be called for a status hearing on June 28, 2011. Crimson's motion for judgment as a matter of law is continued to June 28, 2011.

Dated: June 10, 2011                Enter: _____

JOAN HUMPHREY LEFKOW
United States District Judge