# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PEERLESS INDUSTRIES, INC.,

      Plaintiff,

vs.

CRIMSON AV, LLC, and VLADIMIR
GLEYZER,

      Defendants.

Case No. 1:11-cv-1768

Honorable Joan H. Lefkow

Magistrate Judge Susan Cox

## DEFENDANT'S RENEWED RULE 50 MOTION FOR JUDGMENT
## AS A MATTER OF LAW

# TABLE OF CONTENTS

I. BACKGROUND ...................................................................................................1

II. STANDARD FOR JUDGMENT UNDER FRCP 50 ......................................2

III. ARGUMENT .........................................................................................................2

    A.    **Materiality** ......................................................................................4

        1.    **But-For Materiality: The Broadest Reasonable Construction of the Claims** ...............................................................................5

        2.    **But-For Materiality-Plaintiff's Omissions to the PTO** ..........................5

            a.    Sanus VMPL2 Brackets ........................................................5, 6

            b.    AL-101 Brackets ........................................................................7

            c.    Peerless Gennady/ECN 6102 Brackets ....................................7

            d.    Peerless DFPF-220/320 Brackets .............................................8

        3.    **But-For Materiality: Plaintiff's Misrepresentations to the PTO** ..........9

            a.    Misrepresentation to PTO of Function of Bridge Plate .................9

            b.    Misrepresentation to PTO that Gennady Brackets depicted in Prior Art Had No Ramps bridge Plate or Safety Screw ..........................10

            c.    Misrepresentation to the PTO of the Best Mode ..........................11

        4.    **Egregious Misconduct Before the PTO During Prosecution of '850** ..12

    B.    **Knowledge and Intent** ........................................................................15

        1.    **Intent to Deceive Inferred from Withheld References and Misrepresentations in Prosecution of '850 Patent** ................................16

        2.    **Egregious Litigation Misconduct Supports Inference to Deceive** .........24

IV. CONCLUSION .................................................................................................39

## AUTHORITIES

*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.,*
607 F.3d 817, 829 (Fed. Cir. 2010) ........................................................................3

*Brasseler, U.S.A. I., L.P. v. Stryker Sales Corp.,*
267 F.3d 1370, 1383 (Fed. Cir. 2001)....................................................................23

*DS Smith Plastics Ltd. v. Plascon Packaging, Inc.,*
No. 15 C 5760, 2016 U.S. Dist. LEXIS 1167, at *8 (N.D. Ill. Jan. 6, 2016) ..........3

*Elk Corp. of Dallas v. GAF Bldg. Materials Corp.,*
168 F.3d 28, 32 (Fed. Cir. 1999)...........................................................................15

*Energy Heating, LLC v Heat On-the-Fly, LLC,*
2016-1559 (Fed. Cir. May 4, 2018) ..................................................................13, 18

*In re Sulfuric Acid Litigation,*
231 F.R.D. 351, 363 (N.D. Ill. 2005).....................................................................30

*Intellect Wireless, Inc. v. Sharp Corp.,*
45 F. Supp. 3d 839, 851 (N.D. Ill. 2014) ...............................................................23

*Lumen View Tech, LLC v. Findthebest.com, Inc.,*
811. F. 3d 471, 483 (Fed. Cir. 2016).................................................................. 23-24

*Ohio Willow Wood Co. v. Alps South, LLC.,*
735 F.3d 1333, 1351 (Fed. Cir. 2013)...............................................12, 13, 15, 24

*Orenshteyn v. Citrix Systems, Inc.,*
341 F. Appx. 621 (Fed. Cir. 2004).........................................................................23

*Outside the Box Innovations, LLC v. Travel Caddy, Inc.,*
695 D.3d 1285, 1294 (Fed.Cir. 2012) .............................................................. 12, 13

*Phillips Petroleum Co. v. U.S. Steel Corp.,*
673 F. Supp. 1278, 1336 (D. Del. 1987),
*aff'd,* 865 F.2d 1247, 9 U.S.P.Q.2D (BNA) 1461 (Fed. Cir. 1989)........................2

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,*
324 U.S. 806, 818 (1945) ........................................................................................2

*Reeves v. Sanderson Plumbing Prods.,*
530 U.S. 133, 149 (2000)........................................................................................2

*Regeneron Pharm., Inc. v. Merus N.V.,*
864 F.3d 1343, 1350 (Fed. Cir. 2017)................................................................3, 4, 24

*Rohm & Haas Co. v. Crystal Chem. Co.,*
722 F.2d 1556, 1571 (Fed. Cir. 1983)...........................................................................13

*Tart v. Ill. Power Co.,*
366 F.3d 461, 464 (7th Cir. 2004) ..................................................................................2

*Therasense, Inc. v. Becton, Dickinson & Co.,*
649 F.3d 1276, 1285 (Fed. Cir. 2011) ................................................................ 3, 4, 13, 24

## **OTHER**

37 CFR 1.56...................................................................................................................2

18 U.S.C. § 1001...........................................................................................................21

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PEERLESS INDUSTRIES, INC.,

       Plaintiff,

v.

CRIMSON AV, LLC,

       Defendant.

Case No. 1:11-cv-1768

Honorable Joan H. Lefkow

## DEFENDANT'S RENEWED RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendant, CRIMSON AV, LLC ("Crimson"), by and through undersigned counsel, hereby moves this Honorable Court pursuant to FED. R. CIV. P. 50 for a judgment as a matter of law on a finding of Inequitable Conduct ("IEC") against Peerless in prosecuting U.S. Patent 7,823,850 ("'850 Patent", or "'850"). In support of its motion, Crimson states:

## I. BACKGROUND

The '850 Patent discloses a mounting bracket that affixes to the back of flat panel televisions. The bracket allegedly provides a guiding surface claimed to indicate when a bracket is not correctly aligned, *i.e.*, "misaligned," with a wall mount from which the bracket is to be hung. (Trial Exh. D-1/90, attached as **Exhibit A**, p. 2.)

A jury trial was held in this case from June 13 through 24, 2016. During trial, Crimson presented evidence in support of its position that the '850 Patent was invalid and also unenforceable due to Plaintiff's inequitable conduct. During trial, Crimson filed a Rule 50 Motion on Plaintiff's inequitable conduct. (Dkt. #589.) At the end of trial, the jury found the '850 Patent invalid, and the Court did not rule on Crimson's Rule 50 motion. (Trial Tr. pp. 1522-23.) On March 31, 2017, the Court granted in part Plaintiff's Rule 50 Motion for Judgment as a

Matter of Law, holding that the evidence did not support the jury's verdict finding the '850 Patent invalid for obviousness and best-mode. (Dkt. #672, pp. 9-16.) The parties agreed to $40,000 in damages and entered a stipulation of final judgment. (Dkt. #749.) Crimson now renews its Rule 50 motion seeking a judgment that Peerless' '850 Patent is unenforceable due to Plaintiff's inequitable conduct.

## II. STANDARD FOR JUDGMENT UNDER FRCP 50

A judgment as a matter of law should be entered against the non-movant when a party has been fully heard on an issue, and there is no legally sufficient evidentiary basis for a reasonable fact finder to find for the non-moving party on that issue. *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 149 (2000). "Once the jury has spoken, the court is obliged to construe the facts in favor of the party who prevailed under the verdict." *Tart v. Ill. Power Co.,* 366 F.3d 461, 464 (7th Cir. 2004). "[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same." *Reeves,* 530 U.S. at 150. "It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." *Id.*

## III. ARGUMENT

Presenting a patent application before the United States Patent and Trademark Office ("PTO") requires the applicant to exercise the "highest duty of candor." *Phillips Petroleum Co. v. U.S. Steel Corp.*, 673 F. Supp. 1278, 1336 (D. Del. 1987), *aff'd*, 865 F.2d 1247, 9 U.S.P.Q.2D (BNA) 1461 (Fed. Cir. 1989). This duty of candor is "an uncompromising duty to report to [the PTO] all facts concerning possible fraud or inequitableness underlying the applications in issue." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 818 (1945). *See also* 37 CFR 1.56. This duty extends to "each individual associated with the filing and prosecution of a patent application" to disclose to the PTO all

"information known to that individual to be material to patentability." *DS Smith Plastics Ltd. v. Plascon Packaging, Inc.,* No. 15 C 5760, 2016 U.S. Dist. LEXIS 1167, at \*8 (N.D. Ill. Jan. 6, 2016)(citing *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.,* 607 F.3d 817, 829 (Fed. Cir. 2010).).

To ensure compliance with this duty, the Supreme Court created the equitable defense of inequitable conduct. *Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276, 1285 (Fed. Cir. 2011). A patentee has committed inequitable conduct when it: (1) misrepresented or omitted information material to patentability; and (2) did so with specific intent to deceive the Patent Office. *Regeneron Pharm., Inc. v. Merus N.V.,* 864 F.3d 1343, 1350 (Fed. Cir. 2017). Once inequitable conduct is established as to a single claim, the entire patent is unenforceable. *Id.*

Peerless committed inequitable conduct by deliberately withholding the following four prior art references (hereinafter the "Withheld References") from the PTO during the prosecution of the '850 Patent:

(1) Sanus's VMPL2 bracket;
(2) AL-101 bracket;
(3) Peerless's Gennady/ECN 6102 Brackets;[1] and
(4) Peerless's DFPF-220/320 Brackets.[2]

The evidence shows that the Withheld References contained the three elements of the '850 Patent claims (i.e. the back, side walls configured with ramps, and a safety retainer, such as a bridge plate, or an equivalent bar or tab), either singly or in combination. Moreover, the Withheld References each had the three critical elements arranged in the same way as recited in

---

[1] Former Peerless engineer Gennady Plavnik testified that in 2004 - prior to Lam's conception of the '850 bracket on January 5, 2005, - he designed a universal bracket that was known internally at Peerless as ENC #6102, or the "Gennady Bracket." (Dkt. #602, p. 8; Trial Tr. 906-908.)

[2] The D-FPF-320 was a distributor model. (Dkt. #302, p. 5). The RTFPF-220 was the retail version, and was essentially identical to the D-FPF-320, but smaller. (Dkt. #302, p. 5).

the '850 Patent claims. (Trial Exh. D-43/158, attached as **Exhibit B**; Trial Tr. 928.) The evidence shows that Peerless had knowledge of the four Withheld References prior to filing the provisional application for the '850 Patent, but failed to disclose the references to the PTO.

In addition, Peerless committed inequitable conduct by deliberately making the following misrepresentations to the PTO during the prosecution of the '850 Patent:

(1) Misrepresenting to the PTO that the Gennady Brackets depicted in prior art Figures 1 and 2 of the patent application as having no ramps, bridge plate, or safety screw;

(2) Misrepresenting in the specification and to the PTO the function and purpose of the bridge plate in the specification;

(3) Misrepresenting the that the best mode was a bridge plate, by omitting disclosure of the safety screw and box fold retainer from the specification; and

(4) Filing false inventor Declarations to the PTO.

The '850 Patent would not have issued but for the misrepresentations of the material information set out above. Likewise, the only reasonable inference that can be drawn from Plaintiff making the above misrepresentations to the PTO is intent to deceive it in order to obtain the '850 Patent.

## A. Materiality

Except in cases of "egregious misconduct," the accused infringer must show "but-for materiality," meaning that "the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291-92 (Fed. Cir. 2011). When determining materiality, the Court (1) gives the claims their broadest reasonable construction; and (2) then determines whether, based on the broadest reasonable construction, a reasonable patent examiner would have allowed the claims had he known of the undisclosed prior art. *Regeneron Pharm., Inc. v. Merus N.V.,* 864 F.3d 1343, 1351 (Fed. Cir. 2017)("Determining but-for materiality requires that the court place itself in the shoes of a patent examiner and determine whether, had the reference(s) been before the examiner at the time, the

claims of the patent would have still issued.")  In determining the materiality of a reference, the Court applies a preponderance of the evidence standard. *Id.* at 1350.

1.      **But-For Materiality: The Broadest Reasonable Construction of the Claims**

Here, the claim recites a "guiding surface including a longitudinal surface directly joining" "the side portions to each other" (claim 1) or "the pair of first ramped surfaces to each other" (claim 9).  (**Exhibit A**, pp. 6-7.)  The broadest reasonable construction of main claim 1 is that it defines a mounting bracket having a back (to secure it to a television screen) with two spaced-apart side walls, each of which is configured with a ramped surface, and which bracket includes a "guiding" straight surface "connecting" the two side walls together.  (**Exhibit A**, pp. 6-7.) Main claim 9 recites the same structure, in which the straight guiding surface connects the first ramped surfaces of the side walls together. (**Exhibit A**, p. 7.)

On claim construction, the Court held that the phrase "longitudinal surface directly joining" means "a straight surface connecting the two sides or ramps together that is not limited to a single, unbroken surface." (Dkt. #330, p. 14.)  The Court also ruled that a 2-part box fold satisfied the "straight surface" claim language construction. (Dkt. #330, pp. 14-16.)

Further, claim 11 recites the mounting bracket of claim 9 with a "second ramped surface configured to contact one of the one or more retaining portions" during mounting. (**Exhibit A**, p. 7.) Though this language is excessively broad, claim 11 extends to any configuration of lower ramps, regardless of whether those lower ramps are joined together by a longitudinal retaining surface that extends between the lower ramps. Thus, the broadest reasonable construction of the claims does not require that the straight surface be actually joined to both of the lower ramps.

2.      **But-For Materiality-Plaintiff's Omissions to the PTO**

a.      Sanus VMPL2 Brackets

The jury found Sanus VMPL2 bracket to be material prior art. (Trial Tr. 1522-23). Trial testimony and exhibits showed that the VMPL2 mount includes brackets, each having a back and side walls configured with both upper and lower ramps. (Trial Exhs. D-67/247, attached as **Exhibit C**; D-48/182, attached as **Exhibit D**; D-70/252, attached as **Exhibit E**; Trial Tr. 995-998.) The VMPL2 bracket had the lower ramps that Lam asserted in his Invention Disclosure was the only inventive aspect of the '850 Patent. (*Id.*; D-83/310, attached as **Exhibit F**, Trial Tr. 501-502; Dkt. #602, p. 6.) The VMPL2 bracket also had a straight longitudinal bar "connecting," the side walls of the bracket within the meaning of this Court's construction.

The VMPL2 longitudinal bar meets the Court's definition of a "longitudinal surface," in that it is "a straight surface connecting the two sides or ramps together." When in place, the VMPL2 longitudinal bar bridged the space between the bracket side walls adjacent to its lower ramps, thereby "connecting" them. Thus, under the broadest reasonable construction of the claims, the VMPL2 individually covered all three elements of the combination '850 Patent combination, arranged in the same way.

One of the inventors, Lam, was familiar with the VMPL2 bracket in 2004. (Trial Tr. 993, 998-1001, 1230, 1235-1237; **Exhibit E**). In fact, the VMPL2 was mounted on the wall in his work space at Peerless where the design team studied it. (Trial Tr. 1235-1237). The Examiner did not have the VMPL2 to consider in combination with the other references known to the PTO during prosecution of the '850 Patent. Placing itself in the shoes of a patent examiner applying the broadest reasonable construction of claims 1 and 9, the Court must find a reasonable patent examiner would not have allowed the '850 Patent claims had he or she known of the VMPL2 Withheld Reference. Therefore, the VMPL2 bracket is but-for material.

b. <u>AL-101 Brackets</u>

The evidence at trial showed the AL-101 mount was a custom manufactured mount that Peerless sold to a company called Activelight in 2004. (Trial Tr. 823-825, 858-859, 906-907.) The AL-101 brackets had the lower ramps Lam stated were the only inventive feature of the '850 bracket, two side walls, and a security screw system. (Trial Tr. 860-863, 866-867; Trial Exh. D-303, attached as **Exhibit G**.)  The AL-101 brackets included out-turned safety screw retaining tabs that extended outward from the lower ramps. (**Exhibit G**, p. 5-6; Trial Tr. 860, 863.)  The out-turned safety screw retaining tabs of the AL-101 fall within the language of claims 9 and 11; claims 9 and 11 do not contain language that limits the configuration of the lower ramps to being connected to each other by a longitudinal surface. (**Exhibit A.**)

Applying the broadest reasonable construction of the claims, the out-turned safety screw retaining tabs are equivalent to in-turned safety screw retainer tabs.  In-turned tabs form a box fold, which the Court held were equivalent to the '850 Patent bridge plate. It would be obvious to a person skilled in the art that the outward-folding retaining tabs on the AL-101 could be folded inward to form a box fold to hold the safety screw.  Peerless did not disclose to the PTO the AL-101 brackets or the box-fold embodiment in '850 Patent. Had Peerless disclosed the AL-101, the patent examiner would not have issued the patent as written, nor issue a claim as broad as claim 11.  Therefore, the Court must find that, had the Examiner known of the AL-101 Withheld Reference, he or she would have rejected the claims over the combination of the prior art box fold and references of record, or the AL-101.  AL-101 is thus but-for material.

c. <u>Peerless Gennady/ECN 6102 Brackets</u>

Peerless omitted disclosure of its own ECN 6102 Bracket, as that would have prevented the issuance of '850 Patent.  Gennady Plavnik worked on the development of the bracket

depicted in Figure 3 of '850 Patent. (Dkt. #602, p. 2.) Plavnik testified at trial that by the time William Lam (i.e. the inventor of the '850 Patent) started working at Peerless, by late 2003, the invention claimed by the '850 Patent was already developed. (Trial Tr. 903-908.) The ECN 6102 Bracket is a bracket Plavnik developed in the summer of 2004 while working at Peerless as a manager of a bracket design project within its Design Group. (Dkt #602, p. 2; Exh. D-89/322, attached as **Exhibit H**.) The Gennady/ECN 6102 had upper and lower ramps and a full width bridge plate as shown in Figures 3 through 5 of '850 Patent. The Gennady/ECN 6102 Bracket is but-for material, because it has the three elements arranged in the same way as in the '850 claims. Had the PTO Examiner been told about the Gennady/ECN 6102 Bracket by Brown, the '850 claims would not have issued, as the Gennady/ECN 6102 Bracket has the bridge plate missing from the Examiner's combination. This is significant, because the incorporation of the Gennady/ECN 6102 Bracket bridge plate into the claims is the only feature of '850 that the Examiner considered was inventive. (Trial Tr. 958-959.) Had the Examiner known about a prior design that made use of an identical bridge plate that connected the two side walls of the mount, he or she would not have allowed the '850 Patent to issue. Therefore, the Peerless ECN 6102 Withheld Reference is but-for material.

    d.  Peerless DFPF-220/320 Brackets

    The Peerless models DFPF-220/320 brackets were identical to the claimed '850 bracket, as they contained the Gennady/ECN 6102 Bracket's bridge plate to connect two lower ramps of either side wall. (Dkt #602, pp. 4-5; Trial Exh. D-94/327, attached as **Exhibit I**.) Peerless distributed that DFPF-320 starting in early October 2004. (Dkt #602, p. 3, 5, 20-25; **Exhibit I**.) The Examiner would not have issued the '850 Patent had he been made aware of Withheld Reference DFPF-220/320 brackets, because they incorporated all of the elements of the '850

claims arranged in the same way. The Gennady/ECN 6102 and the D-FPF-220/320 bracket design were therefore but-for material.

### 3. But-For Materiality: Plaintiff's Misrepresentations to the PTO

#### a. Misrepresentation to PTO of Function of Bridge Plate

Marshall Brown, the patent attorney who prosecuted the '850 Patent, misrepresented the '850 Patent bracket's operational purpose to use the bridge plate as a "guiding surface" to indicate "misalignment" during slide-mounting televisions. That "guiding surface" language is present in all the '850 claims. (Trial Tr. 961.)[3] Claiming the bridge plate as a "guiding surface," despite the fact that it does not actually function to guide anything into place is a misrepresentation as to the nature of the claimed invention. (Trial Tr. 518-519, 1011-1012.) Adding the bridge plate to the claims of '850 was but-for material to the issuance of the patent, as the Examiner repeatedly refused to issue the patent until after the Peerless incorporated the bridge plate into Claim 1 as a "guiding surface." (Trial Tr. pp. 954-959, 961-962; **Exhibit B**, p. 15-19; 24-31, 38-42; 46-214.) Indeed, the Examiner said that he would allow claims only after the addition of the bridge plate of claim 8 to the broad claims. (**Exhibit B** pp. 39-42.) In response, Brown deliberately incorporated the "guiding surface" language into Claim 1 to overcome the *Bremmon* reference. (Trial Tr. 954-959, 961-962; **Exhibit B**, pp. 15-19, 24-31, 39-42.)

However, Lam testified at trial that it is incorrect to refer to the bridge plate as a "guiding surface" because it did not "guide anything" while mounting a television. (Trial Tr. 518-519, 1011-1012.) Lam also testified that the primary function of the bridge plate was to hold the safety screw, not to act as a guiding surface. (Trial Tr. 519, 1011-1012, 1015-1017.) Brown's

---

[3] That language was incorporated directly in main claims 1 and 9 and indirectly in the remainder of the claims, as they were dependent from the main claims. (Trial Tr. 961-964; **Exhibit A**, pp. 14-15.)

amendment to the claims were but-for material, as the Examiner refused to issue the patent until after Brown incorporated the bridge plate into the claims as a "guiding surface." (Trial Tr. 961-964.)

Describing the bridge plate to be a "guiding surface," despite the fact that it does not actually function to guide anything into place, is a false and a material misrepresentation as to the nature of the claimed invention. Its purpose was to misdirect the Examiner's search toward sliding and guiding surfaces rather than the real function, safety screw retainers, of which there were numerous embodiments in the prior art, known to Peerless and withheld from the Examiner.

      b. <u>Misrepresentation to PTO that Gennady Brackets depicted in Prior Art Had No Ramps bridge Plate or Safety Screw</u>

Brown misrepresented the status of the prior art to the PTO by representing that Figures 1 and 2 of the '850 Patent application contained an accurate depiction of the Prior Art. Figures 1 and 2 of the '850 Patent represent to the PTO that upper and lower ramps, bridge plates, and safety screws **did not exist** in the prior art, as it shows only:



(**Exhibit A**, p. 2.)

By including these figures in the'850 Patent applications, Brown misrepresented to the

PTO that Figures 1 and 2 were representative prior art as to which the invention was an improvement at that time. (Trial Tr. 918-922, **Exhibit B**, pp. 183, 195; Trial Exh. D-233/492, attached as **Exhibit J**, pp. 7, 19.) However, Figures 1 and 2 are a misrepresentation of the then-existing prior art, as the Gennady Bracket, D-FPF-220/320, AL-101, and VMPL2 each clearly contained upper and lower ramps to guide the retaining portion into the proper position during the mounting process. And the Gennady Bracket and D-FPF-220/320 contained bridge plates and safety screws. In turn, Lam's Invention Disclosure falsely represented the status of the prior art as Lam included the same Figures 1 and 2 in his invention disclosure, and omitted all of the prior art references that embodied his design. (Trial Tr. 990-992; **Exhibit F**, pp. 1-7.) Had Brown and Lam been honest about the elements of the prior art, the '850 Patent never could have issued.

          c.   <u>Misrepresentation to the PTO of the Best Mode</u>

Peerless failed to disclose to the PTO the best mode for the '850 Patent and the fact that the best mode was known in the art. At trial, Lam and Gleyzer testified that the best mode of the invention claimed by the '850 Patent was to use a box fold to retain the safety screw rather than a bridge plate. (Trial Tr. 1005-1010, 1013-1014, 1260.) However, the specification of the '850 Patent disclosed only welded bridge plates, or a longitudinal surface that could be "**<u>fastened</u>** in other conventionally-known manners" (emphasis added), but does not explicitly state that the box fold (not a mode of fastening, but rather a type of construction) was the best mode for practicing the invention. (**Exhibit A**, p. 4.) Brown's omission of the box fold as known in the art was egregious, because in doing so Brown materially misrepresented the best mode of practicing the '850 Patent to the patent examiner to secure the issuance of the '850 Patent over the prior art.

Peerless also misrepresented the nature of the '850 Patent by omitting the safety screw completely from the '850 specification. Yet, Peerless disclosed it in the '002 Patent application filed about 6-months before the '850 non-provisional application was filed in September 2005. (Trial Tr. 919-921; Trial Exh. D-45/160 attached as **Exhibit K**, p. 2.) Thus, the failure to correct the disclosure at the time of filing '850 Patent in 2005 shows the omission was deliberate. Rather, it appears that Peerless omitted the safety screw from the specification to support Peerless's misrepresentations that the bridge plate served a sliding or "guiding" function during the mounting process. Had the safety screw been disclosed, the Examiner would have recognized that the safety screw interferes with sliding/guiding, and would have directed his prior art search toward safety screw retainers. The Examiner would have considered the tabs of the AL-101 brackets and the bar of the VMPL2 brackets to be equivalents to the bridge plate, as safety screw retention was its real function, as Lam so testified at trial. Omitting the safety screw was deliberate misdirection on the part of Peerless of material information from which we can infer deceptive intent.

### 4. Egregious Misconduct Before the PTO During Prosecution of '850

Peerless, through Lam and Brown, also committed several affirmative acts of egregious misconduct before the PTO while prosecuting the '850 Patent. Misrepresentations of counsel in PTO proceedings are "tantamount to an unmistakably false affidavit," and the lack of reasonable explanation for the several misrepresentations constitute a "collective weight" of evidence that "would support a finding of intent that is the single most reasonable inference." *Ohio Willow Wood Co. v. Alps South, LLC.,* 735 F.3d 1333, 1351 (Fed. Cir. 2013); *Outside the Box Innovations, LLC v. Travel Caddy, Inc.,* 695 D.3d 1285, 1294 (Fed.Cir. 2012) (holding the filing of a false declaration [as the inventors did here] to be equivalent to an "unmistakably false

affidavit.”). Indeed, for affirmative acts of egregious misconduct, such as filing an unmistakably false affidavit, materiality is presumed. *See Ohio Willow Wood Co.,* 735 F.3d at 1345;); *Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276, 1292 (Fed. Cir. 2011)(citing *Rohm & Haas Co. v. Crystal Chem. Co.,* 722 F.2d 1556, 1571 (Fed. Cir. 1983)(stating “there is no room to argue that submission of false affidavits is not material.”).); *Outside the Box Innovations, LLC,* 695 F.3d at 1294 (holding the filing of a false declaration to be equivalent to an “unmistakably false affidavit.”); *Energy Heating, LLC v Heat On-the-Fly, LLC,* 2016-1559 (Fed. Cir. May 4, 2018).

Here, the inventor of the ’850 Patent, William Lam, and the attorney who prosecuted the ’850 Patent on behalf of Peerless, Marshall Brown, committed egregious misconduct before the PTO by submitting a Declaration at the time of filing that contained unmistakably false statements, as to: the inventorship of the ’850 Patent; the existence of prior public knowledge, readiness for patenting (i.e. made misrepresentations as to knowledge of prior sales of the invention); the absence of no prior conception by another; the state of prior art; and the best mode of the invention.

The Declaration submitted by the inventors, William Lam, Garry Monaco, and Dugan O’Keene (“the Inventors”) represented to the PTO that the inventors did not know or believe:

> ‘that the same invention was ever known or used by others in the [U.S.], or described in any printed publication in any country,’ before they invented it; and 2) “that the same invention was patented or described in any printed publication in any country, or in public use or on sale in the [US] for more than one year prior to the filing date” of the application.

(**Exhibit B**, p. 204.) As shown at trial, Peerless made and sold brackets containing some or all of the features claimed by the ’850 Patent by selling mounting solutions that utilized the Gennady Bracket, including models D-FPF-320, RTFPF-220, and the AL-101 between May and October

2004. (Trial Tr. 449, 508, 824-825, 995-1001, 1005.)  It is undisputed that Lam had knowledge of the Gennady Bracket, D-FPF-220/320, and AL-101. (Trial Tr. 503, 508, 894, 898-899, 990-991, 993, 995-996, 997-1001, 1230, 1235-1237.)  Lam was also aware of the VMPL2 as early as 2004, which had identical ramps to the ramps claimed by the '850 Patent. (Trial Tr. 898-899, 993, 995-996, 997-1001, 1230, 1235-1237.)  As each of the aforementioned brackets were on sale before October 14, 2004 (i.e. more than one year prior to the date provisional application was filed on October 14, 2005), the inventors submitted an undeniably false declaration to the PTO to secure the issuance of the '850 Patent by swearing that they had no knowledge as to whether the same invention was in use, or disclosed by others in any printed publication, or in public use/on sale in the United States for more than one year prior to the filing date of the application. (**Exhibit B**, p. 180.)

The inventors also made misrepresentations to the PTO as to the true inventors of the '850 application in the Declaration they filed with the PTO.  As part of the Declaration, the inventors swore that they were the original, first, and joint inventors of the invention claimed in the application. (**Exhibit B**, p. 204.)  However, trial testimony shows that Plavnik was the inventor of the bracket claimed by the '850 Patent, as Plavnik developed the Gennady Bracket. The Gennady Bracket disclosed every element of the'850 claims, from Lam's allegedly inventive ramps, to the bridge plate that the Examiner found to be the sole inventive feature of the '850 Patent.  Further, Lam was aware of the Gennady Bracket, as he testified during trial that his design was intended as an improvement upon the Gennady Bracket. (Trial Tr. 495.)  Despite this, the Declaration filed with the PTO only identified William Lam, Dugan O'Keene, and Garry Monaco as the inventors, and not Plavnik. (**Exhibit B**, pp. 204-207.)  This misrepresentation was never corrected with the PTO by Brown despite multiple opportunities,

and as such, constitutes another example of an undeniably false representation that Peerless made to the PTO in prosecuting the '850 Patent.

## B.     Knowledge and Intent

Direct evidence of intent to deceive is rarely available, but the court may infer intent from the surrounding circumstances. *Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168 F.3d 28, 32 (Fed. Cir. 1999) (intent need not, and rarely can, be proven by direct evidence); *Ohio Willow Wood Co. v. Alps South, LLC,* 753 F.3d 1333, 1349, 1351 (Fed. Cir. 2018) (the collective weight of misrepresentations on materiality can support a finding of deceptive intent that is the single most reasonable inference to be drawn from that evidence.)

The file wrapper for the '850 Patent shows that Peerless did not disclose any of the Withheld References to the PTO during the prosecution, despite the fact that the inventors named in the '850 Patent submitted an executed declaration with their patent application, in which they acknowledged their duty to disclose material prior art to the PTO. (Trial Tr. 925; **Exhibit B**, pp. 19-20, 151-155, 157-159, 170-172, 205.)  Further, the undisputed evidence at trial shows that each of the Withheld References were within the knowledge of Peerless during the entire time the '850 application was prosecuted, and that Peerless knew that these Withheld References were potentially barring because they existed more than one year prior to the filing of its provisional application in October 2005.  Peerless did not disclose the Withheld References to the PTO, because had it done so, the '850 Patent would not have issued.  It is not credible that Brown would NOT understand that; as a result it is clear the Peerless prior art was withheld to gain the patent.  Three of the four Withheld References were Peerless' own products, not those of a third party.  The other was a bracket manufactured by a competitor, Sanus, which Peerless had in possession for its designers and Lam to study.  Although Peerless had ample opportunity to

explain these discrepancy during trial, it did not.

### 1. Intent to Deceive Inferred from Withheld References and Misrepresentations in Prosecution of '850 Patent

The VMPL2 bracket individually had all three elements of the combination '850 Patent, arranged in the same way. It had the lower ramps that Lam asserted in his Invention Disclosure to be the *only* inventive aspect of the '850 Patent. (**Exhibit E; Exhibit F**, p. 3-7**;** Trial Tr. 501; Dkt. #602, p. 6.) Trial testimony shows Peerless had knowledge of the VMPL2 Withheld Reference prior to the prosecution of the '850 Patent. At trial Lam testified he was familiar with the VMPL2 bracket in 2004. (Trial Tr. 998-1001.) It was mounted on the wall of his work space at Peerless. Vladimir Gleyzer, the former head of product design at Peerless, testified that in 2004, the designers at Peerless, including Lam, studied a physical sample of a commercially available VMPL2. (Trial Tr. 993, 1230, 1235-37.) In addition, Plavnik recognized the Sanus VMPL2 depicted from his work experience at Peerless, because one was mounted on a wall in the Design Department no later than mid-summer 2004. (Dkt. #602, p. 6.) Lam violated his uncompromising duty of disclosure by not bringing it to the attention of the PTO. In light of the above knowledge, the only inference that can be drawn from Plaintiff's withholding the VMPL2 reference from the PTO is deceptive intent.

Likewise, in May of 2004, Plaintiff sold its AL-101 brackets, which also had the lower ramps that Lam stated were the only inventive feature of the '850 bracket. (Trial Tr. 908, 911; 824-25, **Exhibit F**.) The AL-101 was manufactured by Peerless and shows Peerless had knowledge of the ramps more than 1 year prior to its application for the '850 Patent. Peerless did not disclose the box fold embodiment in '850. Had the Examiner known the key but-for feature was known in the art, he would have rejected the claims over the combination of the prior art box fold and references of record, or the VMPL2, had he been told about it by Peerless.

Therefore, the information withheld from the PTO was material, and the only inference that can drawn from the failure to disclose the same is intent to deceive to PTO.

In addition, it is critically significant that Lam was fully familiar with the 2004 Gennady Bracket that he depicted in Figures 1 and 2 of '850 Patent. (Trial Tr. 1005; Dkt. #602, pp. 2-3; **Exhibit F**; **Exhibit H**.) The Figures 1 and 2 Gennady Bracket had a full width bridge plate identical to the bridge plate shown and claimed in the '850 Patent. (Trial Tr. 503, 508, 894, 901-902, 990-991.) After all, the Gennady Bracket is where Lam got the bridge plate from. Former Peerless engineer Gennady Plavnik testified that in 2004, prior to Lam's conception of the '850 bracket on January 5, 2005, he designed a universal bracket that was known internally at Peerless as ENC #6102, or the "Gennady Bracket." (Trial Tr. 906-908; Dkt. #602, p. 8.) Lam testified that he had knowledge of the Gennady Bracket at the time that he developed the '850 bracket, and designed his bracket to have lower ramps in an effort to "fix" the features of the Gennady Bracket.[4] (Trial Tr. 503, 508, 894, 990-991.) Lam claimed that he sought to improve the Gennady Bracket by incorporating lower ramps below the bridge plate. (Trial Tr. 503, 508, 894, 990-991.)

The Gennady Bracket, misrepresented in '850 Figures 1 and 2, was actually configured as shown in Peerless drawing P0314546, dated 10/1/2004, drawn by Lam (**Exhibit H**, p. 2):



In his declaration, Plavnik testified that the Gennady bracket included a mounting contact

---

[4] Lam's representation to this Court was false, as Peerless' drawing of the Gennady Bracket, P0314546, reveals that it contained lower ramps connected by a bridge plate, as well as upper ramps. (Dkt #602, p. 2; **Exhibit H**, pp. 1-8).

portion, two side portions that defined a receiving region (as in the '850 bracket), upper and lower ramped surfaces (seen configured in the side walls), and a bridge plate for a safety screw, that extended longitudinally to join the two side walls together. (Dkt. #602, p. 2.) The Figures 1 and 2 Gennady Bracket bridge plate was identical to the longitudinal surface identified as component 120 in the '850 Patent (Tr. Trans. pp. 900, 901-902), since it was the source of surface 120.

By no later than October 7, 2004, the Gennady bracket was ready for patenting, and therefor "on sale" as a matter of law. *Energy Heating, LLC v Heat On-the-Fly, LLC,* 2016-1559 (Fed. Cir. May 4, 2018). A prototype of the Gennady bracket was shipped to TechData Company of Florida on August 31, 2004. (Dkt. #602, p. 8). A number of the Gennady Brackets were sold to Wal-Mart in September of 2004, and three or four of the Gennady Brackets were displayed at the CEDIA Trade Show in September of 2004. (Dkt. #602, p. 8.) Lam released the Gennady Bracket for production on October 5, 2004. (Dkt. #602, p. 3.) Peerless also manufactured and sold iterations of the Gennady Bracket in its own mount models D-FPF-220/320. The brackets for the D-FPF-220/320 mounts were configured as shown in the Peerless Installation and Assembly Instructions for this model of its mounts, P0315646-651, dated October 7, 2004, shown side-by-side with Lam's October 1, 2004 drawing of the Gennady bracket:



(Dkt. #602, pp. 4, 5; **Exhibit H**, pp. 3, 6). The mounting bracket of the D-FPF-220/320 hooked

onto the wall plate as shown in Peerless' October 7 2004 Instructions:



(**Exhibit I**, p. 6). The enlarged view shows the bridge plate functioned to retain a safety screw "DD," more than a year prior to filing the'850 provisional application, Provisional Application No. 60/727,105 (hereinafter "PR'105"). (**Exhibit A**, p. 1; **Exhibit J**, p. 1.)

Further, all three Peerless inventors unquestionably knew of the best mode box-fold retainer design, as they made drawings of it in March 2005, more than six months prior to filing the Provisional Application, PR'105, and over 18 months prior to filing the Regular Application RA'343. (Trial Tr. 1461; Dkt. #602; D-Ex. 345/615, attached as **Exhibit L**.) They knew the box fold design was superior to the welded bridge plate because Plaintiff had abandoned the bridge plate by December 2004. They had several opportunities to correct the omission, but did not. This pattern of knowing concealment demonstrates that Peerless acted with intent to deceive.

Trial evidence showed Figures 1 and 2 of '850 omitted critical details which misled the PTO Examiner. (Trial Tr. 961-962, 973, 976-980.) Plaintiff's attorney, Brown drafted and presented Prior Art Figures 1 and 2 and their description to the Examiner, misrepresenting them as exemplary prior art to show the differences between that prior art and the alleged Lam invention of '850. Lam executed a Declaration under Oath that the disclosure in the application was complete, true and correct. It was not.

Lam admitted that Figures 1 and 2 of '850 depicted the 2004 Gennady Bracket, (Trial Tr. 508-509, 1005), yet it was incorrectly shown in '850 without a lower ramp. This omission was a material misrepresentation. Trial testimony showed that the 2004 Gennady Bracket contained a lower ramp. (Trial Tr. 503, 508, 894, 901-02; Dkt. #602.)  The deliberate omission of a lower ramp in Figures 1 and 2 was intended to support Lam's claim that his inventive concept was the addition of a lower ramp to guide the bracket while mounting.  Yet, Lam had personal knowledge that the AL-101, the VMPL2, the ECN 6102 and the 2004 Gennady Bracket all had lower ramps.

Further, the '850 Gennady Bracket Figures 1 and 2 omitted its bridge plate and safety screw.  Lam acknowledged that he obtained the bridge plate from the Gennady Bracket design. (Trial Tr. 1004-05.)  Had the bridge plate and safety screw been disclosed in Figures 1 and 2, the claims of '850 never would have issued. It is clear from the Examiner's expressly-stated "Reasons for Allowance" that he would have rejected the '850 claims in view of *Bremmon* or VMPL2, had Brown and Lam had correctly represented the Gennady Bracket in Figures 1 and 2 of the '850 Application, and informed the patent examiner as to the state of the other prior art. (**Exhibit B**, pp. 15-19.) But the Examiner was deliberately kept in the dark about the true features of the Gennady Bracket by Brown and Peerless, in order to gain allowance of the claims.

It is obvious that Brown knew that had Figures 1 and 2 been properly depicted to correctly show the Prior Art Gennady Bracket features, no patent could be granted on the brackets.  The fact that Brown deliberately mischaracterized the prior art with the self-evidently sole intent to obtain a patent is clear evidence of intent to deceive.  It is self-evident that Figures 1 and 2 were created with no purpose other than to mislead the PTO as to the nature of the prior art in order to obtain a patent.

Finally, the Patent Act requires that the patent application be filed in the name of the true inventors. 35 USC 115 states:

> ***Inventor's oath or declaration.***
>
> (a) NAMING THE INVENTOR; INVENTOR'S OATH OR DECLARATION.— An application for patent that is filed under section 111(a) . . . shall include, or be amended to include, the name of the inventor for any invention claimed in the application. Except as otherwise provided in this section, each individual who is the inventor or a joint inventor of a claimed invention in an application for patent shall execute an oath or declaration in connection with the application.

A false oath is a violation of 18 U.S.C. § 1001. All three inventors signed a Declaration under Oath on October 14, 2005. (**Exhibit A**; **Exhibit B,** pp. 204 – 207.)  Lam declared under oath that he was an original and first inventor of the lower ramp and the bridge plate, in spite of the fact that neither was true.  He knew in 2004 that numerous prior art brackets had lower and upper ramps: his own D'595 bracket design; the VMPL2; the AL101; the DFPF-220/320 and the 6102 Bracket shipped to TechData; and the Gennady/Figs 1/2 brackets.  Lam also knew the 2004 Gennady Bracket had a full width bridge plate. Lam showed the Jury that he signed a false oath when he acknowledged at Trial that he obtained the bridge plate element of his '850 design from the prior art Gennady Bracket. (Trial Tr. 508-09, 1005.)  He never told that to the PTO.

Further, Lam specifically stated under Oath in the Declaration that the specification "sets forth the best mode contemplated by me of carrying out the invention."  That was false.  The best mode of carrying out the invention was the box fold.  However, the '850 patent does not disclose it.  Clearly, the inventors had knowledge that the description in '850 was in error and the drawings were incomplete, but even though they had ample opportunity, neither they nor Brown did anything to correct the '850 application, as was their uncompromising, continuing duty.

Plaintiff's attorney Brown, before filing the patent application, was charged by statute with the duty to conduct a "reasonable and competent inquiry." He did not discharge his duty.

The bracket is simple. It has only 3 elements: a back, side walls, and a bridge plate. Brown's duty was to ask each inventor what his contribution to the bracket was. Had Brown asked that simple, basic question, he would have learned that the bridge plate came, not from any one of the three, but rather from the prior work of Gennady Plavnik. But, Plavnik is not a named inventor, even though the bridge plate is the critical, but-for element of the combination that made the bracket patentable. The reason is simple: Plavnik's work was a prior art bar that Brown did not want to acknowledge, so Plavnik was cut out of the inventorship equation.[5]

Brown also knew from Lam's Invention Disclosure, that Lam's sole inventive contribution was the lower ramp, not the bridge plate. (**Exhibit F**; Trial Tr. 501.) Further, Brown knew from having filed the D'595 application more than a year earlier on September 21, 2004 and the D'537 application more than two-years prior on August 8, 2003,[6] that other brackets besides the '850 Patent used lower ramps. (Trial Tr. 969-72; Trial Exh. D-216/475, attached as **Exhibit M**; D-217/476, attached as **Exhibit N**.) Thus, Brown knew or should have known that if the lower ramp was Lam's only contribution, he was not an inventor because lower ramps were old in the art. Nothing else being different, it is not an inventive contribution to add a prior art lower ramp to well-known bracket designs. Brown had to know about the VMPL2, the AL-101, the ECN 6102, the Gennady Bracket (as it wound up in Figures 1 and 2, albeit misrepresented) and the D-FPF-220/320 brackets.

Equally significant, upon the Examiner indicating that by adding the bridge plate the combination, the claims would be allowable, Brown immediately should have gone back to the inventors to determine which one of them was responsible for that critical, but-for element. Had he done so, and had Lam been as candid as he was in discovery deposition and at Trial, Brown

---

[5] Brown could have filed during this litigation for correction of inventorship to add Plavnik, but did not do so.

[6] Both D'537 and D'595 are public documents.

would have learned that Lam took the bridge plate from the 2004 Gennady Bracket, and that it was a statutory bar, necessitating abandonment of the '850 application. He clearly did neither. That studied refusal to timely investigate and take action is indicative of an intent to deceive. *Brasseler, U.S.A. I., L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1383 (Fed. Cir. 2001).

No party is ever "reasonably justified" in making false statements to the Patent Office or to the court. *Intellect Wireless, Inc. v. Sharp Corp.,* 45 F. Supp. 3d 839, 851 (N.D. Ill. 2014). The collective weight of evidence in this case shows that Plaintiff acted with specific intent to deceive the PTO, as Plaintiff was only able to obtain the '850 Patent by making material false representations about the purpose of the bridge plate and withholding material, baring prior art.

These are exemplary of Peerless' PTO misconduct, and demonstrate that the only reasonable inference is that of deceptive intent, as Peerless engaged in a pattern of lack of candor before the PTO, making factual representations that were contrary to the true information Peerless clearly knew it could not disclose, because then no patent would issue.

Further, Peerless failed to engage in adequate pre-suit investigation before bringing its patent infringement claim against Crimson. Inadequate pre-suit investigation, or pre-suit due diligence under FRCP Rule 11, followed by filing of a baseless suit, supports deceptive intent as being the most reasonable inference. Here, there is absolutely no evidence of any investigation by Peerless of correct inventorship, prior art known to the inventors, or prior art products available to the trade, most significantly those ready for patenting, on sale or sold by Peerless.[7] *See Orenshteyn v. Citrix Systems, Inc.*, 341 F. Appx. 621 (Fed. Cir. 2004); *Lumen View Tech, LLC v. Findthebest.com, Inc.*, 811. F. 3d 471, 483 (Fed. Cir. 2016) (a key factor would be a pre-

---

[7] It is significant to note that Peerless is a Non-Practicing Entity, having not made brackets coming within the scope of P'850 since early 2006, even before filing RA'343 which matured into P'850. Peerless changed its mounting design, shown but not claimed in '850, to one in which the tilt mechanism was part of the bracket, copying a Sanus mount design.

suit validity analysis). Accordingly, the obvious failure, and indeed refusal, to do due diligence leads to an inescapable inference of intent to deceive the PTO.

### 2. Egregious Litigation Misconduct Supports Inference to Deceive

Post *Therasense*, the Federal Circuit recognized that instances of litigation misconduct also support an inference by the Court that the patentee acted with intent to deceive the PTO. *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F. 3d 1343 (Fed. Cir. 2017). In *Regeneron*, the court sanctioned the patentee, and pointed to nine instances of litigation misconduct, drawing an adverse inference as to specific intent to deceive the PTO. *Id.* at 1356. The collective weight of misrepresentations on materiality can support a finding of deceptive intent that is the single most reasonable inference to be drawn from that evidence. *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1351 (Fed. Cir. 2013). Particularly relevant here are the *Regeneron* instance of failure to produce conception and reduction to practice documents, failure to include a key document from an inventor in its document production, misrepresented to the Court that its production was complete, and, after being ordered to confirm whether it had complied with an order compelling production, falsely representing to the Court that it had complied. As in *Regeneron*, Plaintiff's litigation misconduct in this case was designed to obfuscate its prosecution omissions and misrepresentations. Discovery compliance would have resulted in Peerless producing to Crimson the very evidence it hid from the PTO.

The incontrovertible evidence in this case shows Plaintiff repeatedly defrauded the PTO in prosecuting the '850 Patent application, and then actively worked to suppress evidence of that fraud from the very beginning of this litigation in violation of the initial disclosures required by the Local Patent Rules. Plaintiff knew it could not produce to Crimson documents and information it withheld from the PTO in prosecution of the '850 Patent, and had no intention of

doing so. Plaintiff brought this suit to distract and delay Crimson's entry into the market, and conducted discovery to that end.

As an initial matter, Plaintiff failed to produce the Invention Disclosure within 14 days as required by LPR 2.1. After numerous motions to compel production, it ultimately produced some of these documents at the deposition of Marshall Brown on November 14, 2013, 3½ years late, and only after the Court limited Crimson's statutory invalidity defenses rendering Plaintiff's late production of LPR 2.1(a) documents essentially meaningless. Timely disclosure of the Withheld Gennady/ECN 6102 Brackets and Withheld DFPF-320/220 Brackets along with 2004 sales and public disclosure documents would have short-circuited Plaintiff's patent case and its litigation strategy to harass, delay, distract and ultimately bar Crimson's entry into the Audio-Visual Mount market.

Had Peerless complied with LPR 2.1(a), it would have produced documents in 2011 showing Peerless failed to disclose to the PTO that Gennady Plavnik was the true inventor of the mounting bracket claimed by the '850 Patent application and that it was ready for sale no later than October 7, 2004, which would have barred the issuance of the '850 Patent.

To further deny meaningful discovery to Crimson, Plaintiff did not "separately identify by production number which documents correspond to each [numbered] category" as required by LPR 2.1. Further, a history of the discovery in this case, provided below, shows Plaintiff engaged in a game of hide-and-seek during discovery that effectively delayed Crimson's ability to discover the evidence that Plaintiff had defrauded the PTO to obtain the '850 Patent. Certainly, in light of the totality of Plaintiff's discovery misconduct in this case, the only inference that can be drawn from the aforementioned instances of Plaintiff's egregious litigation misconduct is one of intent to deceive.

Not only did Plaintiff fail to comply with this Court's LPRs, it falsely represented to Crimson and to this Court that it produced documents responsive to LPR 2.1(a)(1) and (2) in production numbers P0004276, P0004280-4354, P0004668-05215, P0005318-5623, P0005658-5759, P0005760-5895, and P0003087-P0008978. (*See* Peerless' Rule 26.1(a) Initial Disclosures, attached as **Exhibit O**, p. 5.)

Under LPR 2.1(a), within 14 days of Crimson's Answer, Plaintiff was required to produce or make the following available for inspection and copying along with its Initial Disclosures:

> (1) all documents concerning any disclosure, sale or transfer, or offer to sell or transfer, of any item embodying, practicing or resulting from the practice of the claimed invention prior to the date of application for the patent in suit. …;

> (2) all documents concerning the conception, reduction to practice, design, and development of each claimed invention, which were created on or before the date of the application for the patent in suit …;

Peerless did not do so.

Plaintiff delayed the depositions of inventors William Lam and Dugan O'Keene until mid-December 2012, after the deadline for the Final Invalidity Contentions in January 2012. On December 12, 2012 and December 13, 2012, during Crimson's respective depositions of O'Keene and Lam, Crimson began to get evidence confirming its suspicion that Plaintiff was hiding information. During those depositions Crimson learned there may have been an undisclosed inventor of the '850 Patent: "Genady," whose last name O'Keene and Lam professed they did not recall. At his deposition, William Lam testified that he "copied" the functional bridge plate and safety screw features of the '850 Patent bracket Figure 3 from "Genady." O'Keene drew into Figure 1 of '850 Patent the safety screw and its retaining bridge

plate that Lam admitted he had copied. Subsequent investigation led Crimson to believe that reference to "Genady" was in fact Dr. Gennady Plavnik, who headed Plaintiff's New Products Development Group at the time Lam and O'Keene were working on adapter brackets under Dr. Plavnik's direction. However, Crimson did not locate any drawings made by Dr. Plavnik during his tenure at Peerless, from January 1, 2004 through February 2005. When it became clear Plaintiff was withholding key evidence from discovery, Crimson independently identified and located Dr. Plavnik. Crimson ultimately secured evidence and a written Declaration from him as to his inventorship of the '850 bracket and Plaintiff's prior work in 2004 on brackets having all the features of '850 claims that were clearly ready for sale, and/or sold by October 7, 2004. (Dkt. #602.)

On January 29, 2013, Crimson issued its Third Request for Production of Document and Inspection of Tangible Things. Crimson requested production of the prototypes of the '850 Patent bracket, and its predecessor designs, sample brackets that appeared to be prototypes or "any item embodying, practicing or resulting from the practice of the claimed invention" or related to the development of the claimed invention. In addition, Crimson sought, pursuant to LPR 2.1(a), all documents concerning the conception, reduction to practice, design and development and the actual brackets shown or prototypes thereof. In addition, Crimson requested documents relating to the concealment by Plaintiff of the best mode of the invention as identified by the inventors in their depositions on December 12 and 13, 2012. This best mode embodiment was not disclosed in '850 Patent, but was disclosed in the related, co-pending applications that resulted in the '002 Patent application, which disclosure in '002 Patent was identified by the inventors as the disclosure missing from '850 Patent. The inventors also testified that they did not tell Plaintiff's counsel to not disclose it in '850 Patent.

On February 6, 2013, Crimson issued a Rule 30(b)(6) deposition notice seeking to take the deposition of Marshall Brown on March 13, 2013, and seeking production of certain documents related to the patent prosecution of the '850 Patent and documents related to Plaintiff's due diligence in filing the patents as well as due diligence related to the Complaints in this lawsuit. Mr. Brown was the Foley & Lardner attorney involved in the prosecution of the '850 application, Though Mr. Brown was not trial counsel in this matter, Plaintiff, continuing its litigation strategy of delaying and then refusing to provide required and relevant information, objected to every request stating the requested prosecution documents were protected by attorney-client privilege and work product immunity.

On February 26, 2013, less than two months before the close of discovery, Plaintiff produced, in an un-organized document dump, more than 221,000 pages of new documents. Even aside from the dubious timing of Plaintiff's document "dump," Plaintiff's production did not comply with its obligations under the Fed. R. Civ. P. 34. Amazingly, Plaintiff's document dump still did not contain the requested documents concerning the conception, reduction to practice, design, development, sale or transfer of the claimed invention.

On February 28, 2013, Plaintiff filed a Cross-Motion for Summary Judgment on patent validity. (Dkt #170.) In its Response, on April 5, 2013, Crimson submitted a declaration prepared by Dr. Plavnik. (Dkt #192-1.) On April 11, 2013, Plaintiff's counsel stated in open court, that to Reply to Crimson's Response, it needed to take the deposition of Dr. Plavnik. That very day, Plaintiff issued two subpoenas for Dr. Plavnik's deposition, a subpoena to testify and a separate subpoena for production of documents in his possession.

On April 10, 2013, after months of trying to arrange the deposition of Marshall Brown, Crimson filed a motion to compel his deposition as well as production of related prosecution

documents. (Dkt #198.)  Peerless refused to produce prosecution documents, arguing they were privileged, and that Crimson should be estopped from discovering them because Crimson had already filed its motion for summary judgment. (Dkt #210, pp. 1-5).

Further on April 17, 2013, after months of delaying the deposition of Plaintiff's 30(b)(6) designee,  the Court compelled the deposition of Nicholas Belcore.[8]  At his deposition, and five days before the discovery deadline, Plaintiff produced a binder of additional documents without any bates numbers.  The first page in the binder asserted without corroboration that the '850 Patent invention was first conceived on January 5, 2005, and was constructively reduced to practice on January 25, 2005.  However, Plaintiff produced no documentation supporting those assertions.

Plaintiff's gamesmanship continued on April 19, 2013, when three days before the end of discovery, Plaintiff abruptly withdrew its subpoena of Dr. Plavnik, as well as its subpoena for the production of documents.  Later that day, given Plaintiff's continued refusal (for over two years) to provide the most basic information on the origination of the '850 Patent, with the looming discovery deadline, Crimson filed a motion to compel production of documents still not produced on the origination of the '850 Patent (Dkt #213) and a motion to compel Dr. Plavnik's deposition (Dkt #214).  In its response, Plaintiff did not deny that it failed to comply with LPR 2.1(a).  Instead, Plaintiff argued Crimson was estopped from seeking such documents because Crimson had already filed a motion for summary judgment. (Dkt #225, pp. 1-3.)

On April 19, 2013, Crimson also filed a motion for sanctions seeking redress for Plaintiff's dumping over 210,000 unorganized pages of documents onto Crimson less than two

_____

[8] Crimson previously moved to compel Plaintiff's deposition pursuant to their 30(b)(6) deposition notice served January 31, 2012. (Dkt #154). The Court granted that motion. (Dkt #157.)  Crimson initially set the deposition of Peerless' 30(b)(6) designee, Belcore, for February 21, 2012.  After a number of objections by Peerless, the Peerless was finally compelled to produce Belcore for a deposition.

months before the close of discovery. (Dkt #212, pp. 10-12.)  Crimson also sought sanctions because Peerless did not answer key interrogatories relevant to Plaintiff's Rule 30(b)(6) witness until two days after the witness, Nicholas Belcore, was deposed, despite the fact that those interrogatories were directly relevant to Belcore's testimony.  In its response, Plaintiff did not deny that it dumped over 210,000 pages of documents on Crimson in the final two months of discovery, merely alleging it was not improper.[9] (Dkt #224, pp. 4-6.)  Further, Crimson brought a supplemental motion for sanctions on April 22, 2013, after Plaintiff dumped another 30,000 pages of documents on Crimson on the day that discovery closed, April 22, 2013. (Dkt #215, p. 3). Similarly, Peerless did not deny engaging in this conduct, but instead denied that its conduct was a "document dump," denied that its conduct was improper, and argued that the delayed production of these documents was, somehow, Crimson's fault. (Dkt #226, pp. 1-3.) The magistrate judge, Susan Cox, ruled in Crimson's favor on the other issues raised in Crimson's motions for sanctions, but did not address Peerless's conduct in engaging in document dumps. (Dkt #235.)

On May 8, 2013, the Court denied without prejudice Crimson's motions to compel the production of documents from Marshall Brown and to compel production of documents on the origination of the '850 Patent.  The Court reasoned that the information would not be needed if the Court were to grant Crimson's motion for summary judgment on invalidity of the '850 Patent.  The Court granted Crimson's motion to compel the deposition of Gennady Plavnik. (Dkt #234.)

On May 31, 2013, Crimson was finally allowed to depose Gennady Plavnik.

---

[9] *In re Sulfuric Acid Litigation*, 231 F.R.D. 351, 363 (N.D. Ill. 2005) ("Noranda is not at liberty under the federal rules to dump massive amounts of documents, which they concede have 'no logical order to them,' on their adversaries and demand that they try to find what they are looking for."). Ultimately the total dumped on Crimson was 315,779 documents.

Importantly, Plavnik testified the drawings Plaintiff produced, dated March 3, 2005 through mid-April 2005, were not the first drawings of the claimed invention; that, in fact, the origination of the designs of those drawings dated back to the summer of 2004, when he created them, and would be found in several "ECN" files in the Peerless' SolidWorks database. Crimson had sought those drawings during discovery. However, Plaintiff failed to produce them, despite repeated requests.

During and after the Plavnik deposition, Crimson requested Peerless produce the specific documents Dr. Plavnik referenced at his deposition, including the Withheld Gennady/ECN 6102 drawings and the Withheld RFPF-320/220 information. Though knowing Crimson had just learned of these references and other conception and design documents, Peerless again refused to produce them, arguing this time the requests "were made after the April 22, 2013 close of discovery and were untimely." (Dkt. #297-9, p. 2.) After a hearing on Crimson's motion to compel (Dkt. #297) production of those documents, on July 23, 2013, the Court ordered Peerless to produce "any and all documents relating to the origination of the invention" and further admonished Plaintiff, stating:

> If there are drawings or documents that reflect, as [Dr. Plavnik] testified, an origination date that occurred before March 3 of 2005 and you are not producing those, then you will be barred as a discovery sanction from saying at trial, unless you can show me that the documents were either destroyed, which happens, or for some reason can't be produced, which happens. But you're going to have to say something at that point under verification because I don't understand how Mr. Plavnik can testify that there is all kinds of stuff that goes back to January, I guess, of the prior year, and there is nothing that's been produced. So I'm warning you. (Hearing Tr. from July 23, 2013, 10).[10]

---

[10] Subsequent to the July 23, 2013 hearing, it was discovered that Peerless was withholding documents showing that it had invented the '850 Patent on October 7, 2004. (**Exhibit G**, p. 1; **Exhibit H**, p. 1. **Exhibit I.**)

On September 30, 2013, the Court denied Crimson's Motion for Summary Judgment on Non-Infringement, and granted Plaintiff's Motion for Summary Judgment of Infringement. (Dkt #329.) Those rulings triggered the next round of discovery motions seeking documents from Plaintiff on the origination date of the '850 Patent. On October 2, 2013, the Court reinstated Crimson's motion for partial summary judgment of invalidity (Dkt #193.) but barred Crimson from maintaining invalidity defenses that it failed to timely disclose – those being the statutory "on-sale bar doctrine" and Plaintiff's failure to name inventor. (Dkt #331.)

On October 11, 2013, Crimson filed a renewed motion to compel seeking the documents Plaintiff was required to produce pursuant to LPR 2.1(a), along with origination documents Plaintiff still not produced, and to compel the deposition of Mr. Brown. (Dkt #333, 1-4.) Plaintiff responded by blatantly misrepresenting the contents of its initial document production to this Court, as it argued that it produced these documents in compliance with Rule 2.1(a) and identified these documents in its Initial Disclosures. If so, they were deceptive and intentionally misleading, as they were dated March 2005, not when actually made in 2004.

Further, Plaintiff's response made numerous misrepresentations to this Court, as identified in Crimson's reply, as Plaintiff's document production still did not contain any sales or Plavnik documents from 2004 or 2005. (Dkt #354, pp. 4-7.)

On October 24, 2013, the magistrate judge, Susan Cox, noted Plaintiff's misrepresentations on this issue, stating:

> As we previously noted, Crimson quite unusually filed a motion for summary judgment prior to the close of discovery. But we also emphasized that discovery was never stayed, so there was, in fact, no reason for plaintiff to have refused production of documents. Plaintiff now, oddly, claims that it produced everything.

(Dkt #359, p. 3.) Judge Cox then ordered Plaintiff to produce all requested documents, to

identify where certain documents are located, to state under verification if a document does not exist, and, most significant, to state under verification, that it has produced everything. (Dkt #359, pp. 3-4). The Court also noted that Plaintiff changed its position as to why the deposition of Brown should not be compelled, and ruled that Crimson was entitled to depose Brown. (Dkt #359, p. 4.) Ultimately, the Court granted Crimson's motion, and ordered Plaintiff to produce the documents on or before November 1, 2013, and to depose Brown on or before November 15, 2013. (Dkt #359, p. 4.)

Despite Judge Cox's unequivocal ruling in Crimson's favor, Plaintiff failed to comply with Judge Cox's order. Instead, Plaintiff produced 283 pages of documents and the verification of John Potts on November 4, 2013 that it had produced "everything." That was not the case however as the November 4 production indicated Plaintiff had additional responsive documents on the origination of the '850 Patent. Further, in his verification, John Potts inexplicably testified that in 2011 and 2012 Peerless had conducted a "comprehensive search for documents potentially relevant to this action," and had identified the information for products that practiced the patent-in-suit, but did not produce those documents until February 26, 2013. (Dkt #370-8, p. 2.) Plaintiff gave no reason for the delay between the time that it had located those documents in the system and the time that it had allegedly produced all the documents that it had in its possession, nor did it provide any justification for the withholding the documents until February 26, 2013, and then purportedly including them in a 221,000 page dump on Crimson seven weeks before discovery ended.

Most importantly regarding the Withheld References ECN 6102 and DFPF320/220, in Peerless' November 4, 2013 production, it for the very first time produced a document, P0314546, showing the ECN 6102 bracket was ready for patenting by October 1, 2004, *i.e.*, that

is singly covered all three elements of the combination '850 Patent, and moreover it was an on sale bar. The duplicity of Plaintiff lay in its having produced to Crimson before the end of discovery, document P007948, which showed the same bracket but on a drawing dated March 3, 2005, misleading Crimson that the drawing was post-conception and not a bar. (See Document P007948, filed under seal as **Exhibit P**.)[11]

Peerless' November 4, 2013 production also included documents: P0314589, showing the bracket shipment to TechData on August 31, 2004; P0315646 – 651, the Installation and Assembly instructions for the Withheld D-FPF-320 Reference mounts dated October 7, 2004, showing the brackets were ready for patenting more than a year prior to filing '850 Patent. All these belatedly-produced documents were outside the statutory bar grace period and critically more relevant than the earlier-produced documents. Had these documents been timely produced in 2011 instead of after motion to compel and orders of Court to produce in late 2013 (after the deadline for Crimson's Final Contentions), Crimson would have directed its discovery productively, instead of wandering around in a fog of misdirection. That is a prime example of Plaintiff's misconduct during litigation, as to which the only reasonable inference is deceptive intent.

Crimson filed a third motion to compel, to contest the insufficiency of Plaintiff's production, which this Court granted. (Dkt #370.) During the hearing on Crimson's motion to compel, Plaintiff again attempted to limit the scope of discovery and Plaintiff's counsel made several representations in open court that Plaintiff had already produced all documents responsive to Crimson's requests – that Plaintiff had no more documents and that its Verification supported that position. (Dkt. #381-4, Hearing Tr. from December 3, 2103 4:5-6; 5:8-10; 6:20-

---

[11] The October 1, 2004 date for the drawings is consistent with Dr. Plavnik's insistence that the P007948 drawing had an original date earlier than March 2005. The documents show that Plavnik was correct.

21; 8:7-9.) However, the Court noted, "[i]t seemed pretty clear from this motion (Dkt. #370) that there are – that there have been documents withheld." (Dkt. #381-4, Hearing Tr.,15:16-17.)

On December 3, 2013, Judge Cox ordered Plaintiff, again, "to produce documents itemized in Crimson's motion, including all 6102 documents, prototypes, and all documents previously ordered to be produced." (Dkt #377.) Despite repeated representations that it had produced everything, on December 13, 2013, Plaintiff produced yet another 2,246 pages of documents and finally made a bracket available for inspection at its counsel's office even though Peerless had verified that no brackets existed.[12] On December 18, 2013, Plaintiff inexplicably, and without notice, produced another 840 pages of documents.

Further, it is apparent that Peerless did not actually produce all of the documents that it had in its possession relevant to the '850 Patent. Each of the verifications provided by Peerless were factually inadequate. In the case of the Potts' declaration, his verification was clearly false, as Peerless continued to produce additional discovery that contradicted Peerless' claims that it had fully complied with Crimson's discovery requests. (Dkt #381, pp. 2-3.)

In light of these deficiencies, Crimson's counsel wrote to Peerless' counsel on December 31, 2013, to ask Peerless to verify the completeness of Peerless' discovery, to conduct a request-by-request verification, and to correct several errors in Peerless' document production. (Dkt. #381-6, pp. 1-3.) Peerless' counsel ignored Crimson's request for verification of completeness, but, in obvious misdirection, did respond by specifically contesting each of the other identified

---

[12] Crimson inspected the bracket, but Peerless refused to identify the bracket, despite repeated requests made by Crimson. Peerless' counsel represented to Crimson's counsel, in open Court on March 4, 2014 on Crimson's motion to extend time to file its invalidity motion for summary judgment, that Peerless would respond to Crimson's questions about the bracket. It did not do so. Crimson again wrote to Peerless on March 10, 2014 asking Peerless to identify, among other things, the bracket model and when it was manufactured. Peerless did not respond.

deficiencies from Crimson's letter. (Dkt. #386-1, pp. 1-3.)[13]

As set forth in Crimson's renewed motion for sanctions, filed on January 15, 2014, Plaintiff never provided Crimson with verification that its document production was complete, and ___never even verified that it properly preserved the evidence relevant to this case___, even after Crimson explicitly demanded such a verification in writing. (Dkt #381; Dkt. #381-6, pp. 1-3; Dkt. #386-1, pp. 1-3).

Further, a verification provided by Berkley on January admits that the information Crimson sought __was removed__ from Peerless' computer system, as Berkley testified:

> The results of clicking on "Documentation" for ECN 6102 are shown in P0314804. Clicking on each of the hyperlinks shown in P0314804 results in an error, an example of which is shown on the bottom of P0314804. ***The underlying files appear to have been moved or deleted from the hyperlinked location***. (Emphasis added)

(Dkt. #381-5, p. 3.)

As noted on the face of the document referenced by Berkley's verification, the document produced in P0314804, critical documents were deleted. Peerless' response to Crimson's fifth motion to compel later contended that these documents were not deleted, and that it produced these allegedly deleted documents on January 16, 2014. (Dkt. #386.) So either Berkley lied that they were deleted, or Peerless lied that they were not. However, beyond Peerless' unsupported statements, Peerless produced no evidence by way of verification or otherwise that the documents numbered P0315646 to P0315682 are actually the documents that were deleted from Peerless' system. There was then, and still is now, no way for this Court or Crimson to verify Peerless' claim.

---

[13] Crimson details the full extent of Peerless's bad faith discovery conduct in its Renewed Motion for Sanctions for Plaintiff's Failure to Comply with This Court's Discovery Orders. (Dkt. #381.) As the arguments set forth in Crimson's motion are still applicable to the present case, Crimson fully incorporates its motion for sanctions as though fully set forth therein. (Dkt. #381.)

On January 16, 2014, after yet another verification falsely claimed that Peerless had no more documents to produce, Peerless at last produced some 2004 Plavnik documents, however limited. Peerless produced pre-bar "instruction sheets relating to Peerless model DFPF-320 brackets." These documents should have been produced in 2011 as part of Peerless' initial disclosures and productions under LPR 2.1. These documents establish, without doubt that a reasonable Examiner would have found the '850 Patent invalid as a matter of law pursuant to §102(b).

The belatedly-produced Installation and Assembly instruction sheets (P0315646-651) clearly showed the Peerless model DFPF-320 brackets; that they were ready for sale, being "Approved" by Peerless' Mark Berens prior to the statutory bar date; that the sheets carried a "Patent Pending," notice; and that they were drawn by "WPL," that is, William Phong Lam, the principal inventor. Peerless did not produce to Crimson any documents from 2004 from Berens or Lam, or about any patent application that may have been pending at the time (in October 2004), so the patent pending notice was false, or was reference to the '850 application then in process of being written, but not filed until over a year later.

The production of the DFPF-320 Installation and Assembly instruction documents indicates at the very least that Lam and Berens should have had LPR 2.1 discovery-responsive information on their respective hard drives. Yet, none were produced. Peerless engaged an e-discovery consultant, which should have run proper searches across all of Peerless' databases, not just the ECN database. Responsive documents existed in other databases (where Peerless found some of them), and likely the hard drives of Lam, Plavnik, Berens, and others who worked in the Peerless Design Group in 2004. However, Peerless did not produce anything from those hard drives from the 2004 period. Peerless decided to conduct a belated search only in mid-

January 2014, and it refused to verify that it conducted a proper search and that its production was complete. Peerless ignored the Court's orders and admonishments. Peerless' hide-and-seek approach to discovery is clear intent to deceive. It prejudiced Crimson because this case would have been resolved earlier had Peerless produced all responsive documents in 2011 under the LPRs, which it was obligated to do.

Peerless has still failed to produce huge swaths of evidence relevant to Crimson's inequitable conduct defense. Peerless never produced the entirety of the work e-files of Plavnik, or Lam's work e-files on the ECN 6102 project, including SolidWorks drawings files. Despite Plavnik's testimony that the Gennady Bracket was on display at the CEDIA show in September of 2004, Peerless produced no list of Peerless' employees that attended the show, did not identify what brackets were displayed at the show, and did not produce the promotional materials handed out by Peerless. Further, Crimson was only able to obtain some of the information pertaining to Plavnik because it obtained these documents from Plavnik, who was hesitant to cooperate with Crimson. Peerless also failed to produce any information related to the AL-101 sales to ActiveLight in May 2004, the shipment of ECN 6102 Brackets to TechData in August of 2004, or the sales and shipment information of the DFPF-320 and RTFPF-220 from October through December of 2004. Likewise, Plaintiff produced only fragmentary evidence of the sales of brackets that occurred in 2005. This is the evidence Peerless was required to produce at the start of this litigation under LPR 2.1(a), but did not. Peerless deliberately refused to comply with the LPRs, and has never produced these documents.

Additionally, Peerless engaged in egregious over-litigation and re-litigation to bury Crimson in paperwork, *e.g.* bringing motions that the TRK50B bracket was not prior art on at least 4 separate occasions, including twice after the Court ruled that it was. Peerless counsel

raised that contention the 4th time at the Jury Instruction phase.

Peerless made a mockery of the Federal Rules and the LPRs pertaining to discovery, by deliberately withholding material document production and opposing deposition discovery until after close of discovery, then falsely claimed it would be unfairly prejudiced if Crimson was permitted to rely on Peerless' belatedly produced documents. That claim is absurd, as the evidence Peerless (successfully) sought to exclude were Peerless' own documents relating to work done by its employees in 2004, of which it was fully aware, and that it should have produced under the LPRs and Crimson's Requests, as repeatedly ordered by the Court. The numerous instances of Plaintiff's litigation misconduct set out above demonstrates an inference of intent to deceive.

## IV. CONCLUSION

The conclusion is inescapable. Peerless carried its intent to deceive the PTO into this Court by engaging in litigation misconduct: deliberate selection of evidence to only post-2004 documents; hiding critically relevant evidence; delay through meritless objection and outright disregard of requests and court orders; and specious claims of prejudice by Crimson's defenses. The collective weight of this litigation misconduct is conclusive that the single most reasonable inference to be drawn is that Peerless had, and continues to have, an intent to deceive.

The collective weight of the evidence amply supports the Court's finding of deceptive intent that is the single most reasonable inference that can be drawn from that evidence. In view of the materiality of the withheld references, the Court is respectfully urged to grant Crimson's motion and declare the '850 Patent to be unenforceable as a matter of law based on Peerless' Inequitable Conduct.

Dated: May 23, 2018

Respectfully submitted,

CRIMSON AV, LLC and
VLADIMIR GLEYZER

By:   /s/  Peter R. Ryndak

Joseph R. Marconi (#1760173)
Victor J. Pioli (#6256527)
Peter R. Ryndak (#6238006)
JOHNSON & BELL, LTD.
33 W. Monroe Street, Suite 2700
(312) 372-0770

#5200111

## CERTIFICATE OF SERVICE

I hereby certify that on  May 23, 2018 I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all parties of record.


/s/      Peter R. Ryndak